FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

2014 JAN -7  PM 3: 24

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. |
| | ) | |
| Plaintiff, | ) | **A14 CR0015 SS** |
| | ) | |
| | ) | **INFORMATION** |
| v. | ) | |
| | ) | [Violation: 18 U.S.C. § 1349 - Conspiracy to |
| ARTHROCARE CORPORATION, | ) | Commit Wire and Securities Fraud] |
| | ) | |
| Defendant. | ) | |

## INFORMATION

THE UNITED STATES CHARGES:

### General Allegations

At all relevant times to this Information:

#### Relevant Individuals and Entities

1.      The Defendant, ArthroCare Corporation ("ArthroCare"), was a Delaware corporation headquartered in Austin, Texas.

2.      Among other products, ArthroCare sold medical devices that used its patented technology, called Coblation, to physicians and surgery centers.  Coblation technology was designed to be used by physicians in surgical procedures to remove soft tissue in a way that was minimally invasive.

3.      ArthroCare sold medical devices directly to physicians, surgery centers, and other end-users through its sales representatives and sales agents.  In addition, ArthroCare sold

1

medical devices to distributors, who would then resell ArthroCare's products to physicians, surgery centers, and other end-users.

4.      ArthroCare's stock was traded publicly on NASDAQ, a national securities exchange, and its stock was registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934.

5.      DiscoCare, Inc. ("DiscoCare") was a privately owned Delaware corporation, which was incorporated in 2005. DiscoCare was located at 2047 Palm Beach Lakes, Suite 200, West Palm Beach, Florida. ArthroCare was DiscoCare's only supplier. At various times, DiscoCare was ArthroCare's largest single distributor of medical devices. On December 31, 2007, ArthroCare acquired DiscoCare.

6.      Distributor 1 was a privately owned Oklahoma corporation, which was incorporated in 1988. Distributor 1 acted as a sales agent and then as a distributor of ArthroCare's medical devices.

7.      Distributor 2 was a privately owned California corporation, which was incorporated in 1982. Distributor 2 acted as a distributor of ArthroCare's medical devices.

8.      Distributor 3 was a privately owned Pennsylvania corporation, which was incorporated in 1981. Distributor 3 acted as a sales agent and then as a distributor of ArthroCare's medical devices.

9.      Distributor 4 was a privately owned Australian limited liability company. Distributor 4 acted as a distributor of ArthroCare medical devices until August 2006, when ArthroCare acquired Distributor 4.

10.      From 1997 until February 2009, Michael Baker was employed by ArthroCare. For the entire time period of his employment, Baker was the Chief Executive Officer of

ArthroCare.  Baker also served as a Director on ArthroCare's Board of Directors.  All employees of ArthroCare ultimately reported to Baker.

11.     From 2004 until December 2008, Michael Gluk was employed by ArthroCare. From 2004 until approximately May 2006, Gluk was Vice President of Finance and Administration.  From approximately May 2006 until December 2008, Gluk was the Chief Financial Officer of ArthroCare.  As Chief Financial Officer, all finance and accounting staff at ArthroCare reported to Gluk.

12.     From 1997 until December 2008, John Raffle was employed by ArthroCare. From approximately June 2001 until approximately May 2006, Raffle was Vice President of Corporate Development and Legal Affairs.  From approximately May 2006 until December 2008, Raffle was the Senior Vice President of Strategic Business Units.  As Senior Vice President of Strategic Business Units, all marketing and sales staff at ArthroCare reported to Raffle.

13.     From 2001 until December 2008, David Applegate was employed by ArthroCare. In approximately February 2004, Applegate became the Vice President in charge of ArthroCare's Spine division.  As the Vice President in charge of the Spine division, all marketing staff in the Spine division reported to Applegate.  In 2006, all sales staff in the Spine division also began reporting to Applegate.  In April 2008, Applegate was promoted to Senior Vice President.

<u>The Federal Securities Laws and SEC Rules and Regulations</u>

14.     The SEC was an independent agency of the United States government that was charged by law with preserving honest and efficient markets in securities.  The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly

traded companies was accurately recorded and disclosed to the investing public.  As a publicly traded company, ArthroCare and its directors, officers, and employees were required to comply with the federal securities laws, regulations, and rules.  Under the federal securities laws and regulations, ArthroCare was required, among other things, to file with the SEC annual reports (known as SEC Forms 10-K), quarterly reports (known as SEC Forms 10-Q), and other periodic reports that included accurate and reliable financial statements.

### The Scheme to Defraud

#### A.    Overview of the Scheme

15.    From at least December 2005 through in or about December 2008, Baker, Gluk, Raffle, Applegate, and others, known and unknown, devised, intended to devise, and executed a scheme to defraud ArthroCare's shareholders and members of the investing public by:  (a) inflating falsely ArthroCare's revenue by tens of millions of dollars; (b) concealing the nature and financial significance of ArthroCare's relationship with DiscoCare and other distributors; and (c) using a series of sham transactions to manipulate ArthroCare's revenue and earnings as reported to investors.

#### B.    Purpose of the Scheme

16.    The purpose of the scheme was to:  (a) conceal from ArthroCare's shareholders, the investing public, and ArthroCare's external auditors the true nature of the purported sales to ArthroCare's distributors; (b) make materially false and fraudulent representations to ArthroCare's shareholders and the investing public about ArthroCare's financial condition in order to maintain and increase the market price of ArthroCare's stock; and (c) enrich Baker,

Gluk, Raffle, and others through the continued receipt of compensation and the appreciation of their own ArthroCare stock and stock options.

17.     Baker, Gluk, Raffle, Applegate, and others inflated falsely ArthroCare's sales and revenue through a series of end-of-quarter transactions involving ArthroCare's distributors, including DiscoCare and Distributors 1 through 4.  After Baker, Gluk, Raffle, Applegate, and others determined the type and amount of product to be shipped to distributors based on ArthroCare's need to meet sales forecasts, rather than the distributors' need for the products, Baker, Gluk, Raffle, Applegate, and others caused ArthroCare to ship millions of dollars worth of ArthroCare's medical devices to its distributors at the end of quarters.  ArthroCare would then report these shipments as sales in its quarterly and annual filings at the time of the shipment, enabling the company to meet or exceed internal and external earnings forecasts.

18.     However, as Baker, Gluk, Raffle, and Applegate knew, ArthroCare's distributors agreed to accept shipment of millions of dollars of excess inventory because ArthroCare had agreed to:  (a) provide the distributors extended payment terms; (b) pay the distributors substantial, upfront cash commissions; (c) allow the distributors to return the product; and (d) in some cases, acquire the distributor and the excess inventory so that the distributor would not have to ultimately pay ArthroCare for the products at all.

19.     Baker, Gluk, Raffle, and Applegate caused ArthroCare to inflate falsely its revenue by tens of millions of dollars, as ArthroCare was prohibited from counting such shipments as sales under the accounting rules governing revenue recognition and also under ArthroCare's internal revenue recognition policy.  In addition, ArthroCare failed to disclose the conditions related to the shipment of the product in its quarterly and annual filings, and instead claimed in its filings that that it was following the revenue recognition rules.  In essence, Baker,

Gluk, Raffle, and Applegate caused ArthroCare to park tens of millions of dollars of its

inventory with its distributors, while causing ArthroCare to inform investors that it had actually

sold the product.

20.     Baker, Gluk, Raffle, and others also concealed the nature and extent of

ArthroCare's relationship with DiscoCare and other distributors.  With respect to DiscoCare,

Baker, Gluk, Raffle, Applegate, and others arranged to have ArthroCare purchase DiscoCare on

December 31, 2007 to conceal from investors the nature and financial significance of

ArthroCare's relationship with DiscoCare, including that:  (a) DiscoCare was, by far,

ArthroCare's largest single source of revenue from December 2005 through December 2007, and

that ArthroCare reported over $37 million in revenue in its publicly filed financial statements

based on purported sales to DiscoCare; (b) DiscoCare accounted for almost all of the growth in

ArthroCare's Spine division during that time period; (c) DiscoCare accounted for almost all of

the growth in ArthroCare's Sports division in the Third and Fourth Quarters of 2007; (d)

DiscoCare's receivable to ArthroCare (the amount that DiscoCare owed to ArthroCare) was, by

far, the largest of any ArthroCare customer, and that by December 2007, DiscoCare owed

ArthroCare over $26 million; (e) ArthroCare billed DiscoCare nearly four times as much for

medical devices as compared to what ArthroCare billed its other customers; and (f) the vast

majority of DiscoCare's business was contingent on obtaining payment for the medical devices it

purchased from ArthroCare through the settlement of personal injury cases.

21.     Baker, Gluk, Raffle, Applegate, and others also manipulated ArthroCare's

revenue and earnings reported to investors through a series of sham transactions.  When Baker,

Gluk, Raffle, Applegate, and others learned, after the end of a reporting period, that ArthroCare's

revenues or earnings were less than a desired amount, they caused ArthroCare to manipulate

revenue or earnings through sham transactions designed to increase revenue or earnings.  When Baker, Gluk, Raffle, Applegate, and others learned, after the end of a reporting period, that ArthroCare's revenues exceeded a desired amount, they caused ArthroCare to enter into sham transactions that lowered revenue.

### C.  False Inflation of ArthroCare's Earnings

22.    Shareholders of ArthroCare stock, stock market analysts, and members of the investing public tracked ArthroCare's earnings per share or "EPS."  EPS was considered a key determinant of a company's share price because it reflected a company's profitability. ArthroCare reported its EPS each quarter in Forms 10-Q, and each year in Forms 10-K, which were filed with the SEC.

23.    Between in or about 2005 through in or about July 2008, ArthroCare executives communicated to the shareholders of ArthroCare stock, stock market analysts, and members of the investing public that ArthroCare would grow revenue and EPS by at least twenty percent each year.

24.    Based in part on these communications from ArthroCare executives, and prior to ArthroCare's financial reporting for each quarter and for each year, stock market analysts issued forecasts for the company's EPS.  The average of the analysts' predictions about ArthroCare's EPS was referred to as the "consensus EPS."

25.    Baker, Gluk, Raffle, and other senior executives at ArthroCare closely tracked the consensus EPS for each quarter and each year.

26.    For each financial reporting period from December 2005 through December 2007, ArthroCare purportedly met or exceeded the stock market analysts' consensus EPS.

27.     As described in Paragraphs 15 through 21 above, Baker, Gluk, Raffle, Applegate, and others directed the end-of-quarter shipments to ArthroCare's distributors and engaged in other sham transactions in order to overcome quarterly revenue shortfalls and to meet the consensus EPS. Baker, Gluk, Raffle, Applegate, and others concealed the true nature of the purported sales on the end-of-quarter shipments from ArthroCare's external auditors so that ArthroCare could recognize as revenue the purported sales in ArthroCare's publicly filed financial statements and so that ArthroCare would meet the consensus EPS.

D.     The Victims

28.     Between December 2005 and December 2008, ArthroCare's shareholders held more than 25 million shares of ArthroCare stock.

29.     On July 21, 2008, ArthroCare announced publicly that it would be restating its previously reported financial results from the Third Quarter 2006 through the First Quarter 2008. That day, the price of ArthroCare shares dropped from approximately $40.03 to approximately $23.21 per share. On December 19, 2008, ArthroCare announced publicly that it had identified accounting errors and possible irregularities in its revenue recognition practices going back to 2005. That day, the price of ArthroCare shares dropped from approximately $16.23 to approximately $5.92 per share.

30.     The scheme to defraud caused a loss to shareholder victims of ArthroCare of over $400 million.

**THE CHARGES**

**COUNT ONE**
**Conspiracy to Commit Wire and Securities Fraud**
**(18 U.S.C. § 1349)**

31.     Paragraphs 1 through 30 of this Information are realleged and incorporated by reference as though fully set forth herein.

32.     Between approximately December 2005, the exact date being unknown to the Grand Jury, through at least December 2008, in the Western District of Texas and elsewhere, the defendant **ARTHROCARE CORPORATION** did knowingly and willfully conspire and agree with others to commit certain offenses against the United States, namely:

> a.  wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing certain wire communications to be transmitted in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343; and
>
> b.  securities fraud, that is, to knowingly and intentionally execute a scheme and artifice (i) to defraud any person in connection with any security of ArthroCare, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l), and (ii) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of ArthroCare, an issuer with a class of

9

securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l),  in violation of Title 18, United States Code, Section 1348.

### Purpose of the Conspiracy

33.    The United States realleges and incorporates by reference Paragraph 16 of this Information as a description of the purpose of the conspiracy.

### Manner and Means

34.    The United States realleges and incorporates by reference Paragraphs 16 through 27 of this Information as a description of the manner and means of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

JEFFREY H. KNOX
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____

Benjamin D. Singer
Deputy Chief
Fraud Section, Criminal Division
U.S. Department of Justice